UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
NAKIA BOND, JULIO RODRIGUEZ, and
WILLIAM TORRES,

                Plaintiffs,

      -against-

WELPAK CORPORATION, THOMAS
RYAN, officially and individually, and
CHRISTOPHER FOX, officially and
individually,

                Defendants.
-------------------------------------------------------X

Docket No.: 15-CV-2403
(JBW)(SMG)


## DEFENDANTS' MEMORANDUM OF LAW
## IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT


Adam C. Weiss (AW-5752)
THE LAW FIRM OF ADAM C. WEISS, PLLC
3 School Street, Suite 303
Glen Cove, New York 11542
(516) 277-2323 (tel)
(516) 759-2556 (fax)
Email: adam@acweisslaw.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................ii

PRELIMINARY STATEMENT........................................................................1

STATEMENT OF FACTS...............................................................................2

Welpak Corporation is a Registered Interstate Carrier...........................................2

Nakia "Shawn" Bond drove Welpak trucks in Interstate Commerce..........................3

Julio Rodriguez drove Welpak trucks in Interstate Commerce...............................4

William Torres acted as a Driver's helper in Interstate Commerce..........................6

Application of the Federal Motor Carrier Act to Welpak's operations......................7

The Trucks Leased by Welpak......................................................................8

ARGUMENT...............................................................................................10

    A.  The Summary Judgment Standard...................................................10

    B.  The Motor Carrier Exemption Applies Because Drivers and Driver's
        Helpers Transport Property in Interstate Commerce..................................11

        1.  Welpak is Properly Classified Within the Jurisdiction of the Secretary
            by Virtue of Operating as a "Motor Carrier".....................................13

        2.  Each of the individual Plaintiffs fall within an exempt classification
            under the Federal Motor Carrier Act..............................................17

Bond and Rodriguez, as drivers, are overtime exempt under the FMCA....................17

Torres, as a driver's helper and loader, is overtime exempt under the FMCA.............18

    C.  Plaintiffs' Second Cause of Action for Failure to Pay Overtime under
       State Law is Subject to Dismissal Due to the Motor Carrier Exemption..........20

    D.  This Court Should Decline to Exercise Supplemental Jurisdiction Over the
       Plaintiffs' Remaining State Law Claims..............................................21

CONCLUSION............................................................................................22

# TABLE OF AUTHORITIES

Alleyne v. Time Moving & Storage Inc., 264 F.R.D. 41 (E.D.N.Y. 2010)............17-18

Anderson v. Liberty Lobby Inc., 477 U.S. 242 (1986)...................................10-11

Avery v. Chariots for Hire, 748 F.Supp.2d 492 (D. Md. 2010)....................18-19

Bilyou v. Dutchess Beer Distributors, Inc., 300 F.3d 217 (2d Cir. 2002)............15, 17

Brooks v. Halsted Commc'ns, 620 F. Supp. 2d 193 (D.Mass. 2009).................20

Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343 (1988).....................................21

Celotex Corp. v. Catrett, 477 U.S. 317 (1986)................................................10

Dalton v. Sabo, Inc., 2010 WL 1325613 (D.Or. April 1, 2010)..........................18

Dauphin v. Chestnut Ridge Transp., Inc., 544 F. Supp. 2d 266
(S.D.N.Y. 2008)..........................................................................12, 17, 20

Fox v. Commonwealth Worldwide Chauffeured Transp. of NY, LLC,
865 F. Supp. 2d 257 (E.D.N.Y. 2012)...................................................12, 19

Foxworthy v. Hiland Dairy Co., 997 F.2d 670 (10th Cir. 1993)............................15

Hernandez v. Brink's Inc., 2009 WL 113406 (S.D. Fla. Jan. 15, 2009)..............20

Kahn v. IBI Armored Serv., Inc., 474 F. Supp. 2d 448 (E.D.N.Y. 2007).............20

Klein & Co. Futures, Inc. v. Bd. Of Trade of the City of New York,
464 F.3d 255 (2d Cir. 2006)..................................................................21

Kolari v. New York-Presbyterian Hosp., 455 F.3d 118 (2d Cir. 2006)...................21

Levinson v. Spector Motor Serv., 330 U.S. 649 (1947)............................12, 18-19

Lujan v. National Wildlife Fed'n, 497 U.S. 871 (1990)....................................10

Martin v. Malcolm Pirnie, Inc., 949 F.2d 611 (2d Cir. 1991)...........................10

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986)...............10

Morris v. McComb, 332 U.S. 422 (1947)..........................................12, 15, 17

Pyramid Motor Freight Corp. v. Ispass, 330 U.S. 695 (1947)...................12, 18-19

Reich v. American Driver Serv., Inc., 33 D.3d 1153 (9th Cir. 1994).......................15

Resch v. Krapf's Coaches Inc., 14-3679 (3d Cir. May 12, 2015)..........................16

Songer v. Dillon Res., Inc., 618 F.3d 467 (5th Cir. 2010)...................................16

Torres v. Gristede's Operating Corp., 628 F. Supp. 2d 447 (S.D.N.Y. 2008).........20

Walling v. Jacksonville Paper Co., 317 U.S. 564 (1943)...................................15

Williams v. Tri-State Biodiesel, LLC, 2015 WL 305362
(S.D.N.Y. Jan. 23, 2015).............................................................................12

## PRELIMINARY STATEMENT

Defendants, Welpak Corporation ("Welpak"), Thomas Ryan ("Ryan") and Christopher Fox ("Fox"), by and through their undersigned attorneys, The Law Firm of Adam C. Weiss, PLLC, hereby file this Brief in Support of their Motion for Summary Judgment under Federal Rule of Civil Procedure ("Fed.R.Civ.P.") Rule 56(a) on all three Causes of Action in the Complaint. Based on the undisputed facts, Plaintiffs, Nakia Bond ("Bond"), Julio Rodriguez ("Rodriguez") and William Torres ("Torres") cannot establish as a matter of law that Defendants' alleged actions were unlawful, and thus the Complaint should be dismissed in its entirety, with prejudice.

In the First and Second Causes of Action of the Complaint, Plaintiffs claim that Defendants' failure to pay them overtime for all the hours they worked over 40 hours per week violates the Fair Labor Standards Act ("FLSA") and New York Labor Law ("NYLL"). Both Causes of Action are subject to dismissal because the undisputed facts establish that Plaintiffs Bond and Rodriguez (as drivers) and Plaintiff Torres (as a driver's helper) were exempt from the overtime requirements under the FLSA due to the "Motor Carrier" exemption. Indeed, it is undisputed that Welpak is a registered Interstate Motor Carrier with the United States Department of Transportation and Plaintiffs concede that virtually every day of their respective employments, Plaintiffs drove (and rode) in trucks with gross vehicle weight over 10,001 pounds, engaging in duties which were crucial to the safety of the operation of those trucks, utilizing public highways which regularly crossed state boundaries throughout the eastern seaboard of the United States, from Connecticut, New Jersey and New York to Georgia and Florida.

1

In the Third Cause of Action of the Complaint, Plaintiffs allege a purely state law-based claim that Defendants' practice of paying employees every two weeks violated the provisions of NYLL 191(1)(a)(i), which requires New York employers to pay "manual workers" every seven days.  Here, even setting aside the question of whether Plaintiffs were indeed "manual workers" under New York law, the Court should decline to exercise supplemental jurisdiction over these state claims because all of Plaintiffs' federal law claims, as described above, require dismissal.

## STATEMENT OF FACTS[1]

Welpak Corporation is a Registered Interstate Carrier

Defendant Welpak is a transportation, storage and packing company based on Maspeth, New York.  See Defendants' Rule 56.1 Statement ("Defs' 56.1 Stmt"), at ¶ 5. Thomas Ryan is the founder, owner and president of Welpak.  Id., at ¶ 6.  Welpak is registered with the United States Department of Transportation (US DOT) as a motor carrier.  Id., at ¶ 7.  Since in or about 1997, Welpak has been registered under the US DOT Number 778253.  Id., at ¶ 8.  It also has a Certificate of Public Convenience and Necessity, No. MC-363810.  Id., at ¶ 9.  As an interstate carrier, Welpak operates under the federally mandated 11-hour rule where truck drivers and helpers are expected to work up to 11 hours per day in straight time.  Id., at ¶ 10.

Welpak derives at least 50% of its gross income from interstate commerce.  Defs' 56.1 Stmt, at ¶ 11.  Welpak employs drivers whose responsibilities include driving trucks on designated assignments.  Id., at ¶ 12.  In order to comply with the US DOT regulations

---

[1] This Statement of Facts is largely drawn from Defendants' Statement of Undisputed Material Facts pursuant to Local Rule 56.1, which is being filed concurrently with this Memo of Law.

for holders of CDLs, Welpak maintains "Driver Qualification Files' for its drivers, including Bond and Rodriguez, reflecting that the drivers meet the minimum qualifications for drivers of commercial motor vehicles in interstate commerce. Id., at ¶ 13.

In the Driver Qualification File, as detailed by a US DOT Federal Motor Carrier Safety Administration summary, for each driver, Welpak includes (a) the driver's application for employment; (b) an inquiry sent to state agencies regarding the driver's driving record for the preceding three years; (c) an inquiry sent to state agencies requesting the driver's annual driving record; (d) the motor carrier/employer's annual review of the driver's driving record; (e) the driver's annual certification of motor vehicle violations; (f) the driver's road test certificate; and (g) the driver's proof of medical clearance, the medical Examiner Certificates. Defs' 56.1 Stmt, at ¶ 14. Other documents Welpak maintains in the Driver Qualification Files include: (a) records of random drug and alcohol tests on the drivers, (b) proof of the driver's commercial driver's license, (c) proof the driver meets the US DOT physical qualifications, and (d) FMCA Certification of Compliance with Driver License Requirements. Id., at ¶ 15. Drivers are also required to maintain Driver Logs in accordance with US DOL whenever they travel outside of the 100 mile radius from the depot or point of origination. Id., at ¶ 16.

Nakia "Shawn" Bond drove Welpak trucks in Interstate Commerce

Welpak employed Plaintiff Nakia Bond as a driver from on or about October 22, 2012 to on or about March 18, 2014. Defs' 56.1 Stmt, at ¶ 17. Welpak maintains time sheets and payroll records to show how many hours Bond worked every week and how much he was paid for every hour he worked. Id., at ¶ 19. Bond spent more than 99% of his work time at Welpak performing truck-related activities. Id., at ¶ 20. Bond verified at

3

his deposition that the hours listed on his paystubs accurately reflected the hours that he actually worked each week that he worked at Welpak as per the time records maintained by Welpak. Id., at ¶ 22.

When Bond was paid, every two weeks, he would receive a computer printout of his hours reportedly worked in the previous two weeks with his paystub, so he could compare the hours that he punched in/out with the hours on his paystub and verify their accuracy. Defs' 56.1 Stmt, at ¶ 23. If Bond brought any discrepancies to Welpak's attention then corrections could and were made to his pay. Id., at ¶ 24. Bond's regular rate at the time he started working at Welpak was $17 an hour. Id., at ¶ 25. If Bond worked 45 hours in a 5-day work week, then it was Welpak's practice to pay him overtime at the rate of $25.50 an hour for all hours worked over 45. Id., at ¶ 26.

Bond filled out an I-9, W-4 and other paperwork at the time he was hired. Defs' 56.1 Stmt, at ¶ 27. At the time of his hiring, Bond knew that Welpak required that for the position that he was applying for (driver) that he hold a valid Commercial Driver's License (CDL), Class B, which he indeed had. Id., at ¶ 28. Throughout Bond's employment at Welpak, he drove trucks in interstate commerce. Id., at ¶ 29. Bond drove trucks pursuant to his official duties for Welpak through every state from New York and Connecticut to Florida throughout his employment. Id., at ¶ 30.

As a driver in interstate commerce, Bond had to maintain driver's daily logs when he went on certain road trips; the driver's logs showed the time that he spent driving and had to be stowed in the cab of the truck. Defs' 56.1 Stmt, at ¶¶ 31-32. For example, on February 19, 2014, Bond spent 11 hours working and 10 ½ of those hours were driving, which Bond signed and verified. Id., at ¶ 33. Bond also confirmed that he signed and

4

verified the driver's logs for October 7 and October 8, 2013 as accurate reflections of how he spent those two days. Id., at ¶ 34.  Bond never maintained his own personal records of the daily assignments or the hours he worked and has no basis to contradict the route sheets maintained by Welpak. Id., at ¶ 35.

When Bond went on long-distance trips up and down the eastern seaboard, he often had to stay overnight in hotels. Defs' 56.1 Stmt, at ¶ 36.  Bond verified at his deposition that Defendants' Exhibit F were examples of hotel receipts from many of those overnight trips. Id., at ¶ 37.

Julio Rodriguez drove Welpak trucks in Interstate Commerce

Welpak employed Julio Rodriguez as a driver from on or about May 6, 2013 to on or about March 18, 2015. Defs' 56.1 Stmt, at ¶ 38.  Welpak maintains time sheets and payroll records to show how many hours Rodriguez worked every week and how much he was paid for every hour he worked. Id., at ¶ 39.  Rodriguez spent over 99% of his work time at Welpak performing truck-related activities. Id., at ¶ 40.

Rodriguez verified at his deposition that the hours listed on his paystubs accurately reflected the hours that he actually worked each week that he worked at Welpak as per the time records maintained by Welpak and that he does not recall any hours ever being missing. Defs' 56.1 Stmt, at ¶ 42. When Rodriguez was paid, every two weeks, he would receive a computer printout of his hours reportedly worked in the previous two weeks with his paystub, so he could compare the hours that he punched in/out with the hours on his paystub and verify their accuracy. Id., at ¶ 43.  Rodriguez's regular rate at the time he started working at Welpak was $18 an hour and he received a raise to $19 an hour. Id., at ¶ 44.

5

When Rodriguez approached Welpak for a job, he applied for a driver position. Defs' 56.1 Stmt, at ¶ 45. Welpak hired Rodriguez as a driver and, indeed, he verified at his deposition that he spent most of his work time "on the road." See Id., at ¶ 46. At the time of his hiring, Rodriguez knew that Welpak required that for the position that he was applying for (driver) that he hold a valid Commercial Driver's License (CDL), Class B, which he indeed had. Id., at ¶ 47.

Throughout Rodriguez's employment at Welpak, he drove trucks in interstate commerce. Defs' 56.1 Stmt, at ¶ 48. Rodriguez drove trucks pursuant to his official duties for Welpak through every state from New York, New Jersey and Connecticut to Georgia throughout his employment. Id., at ¶ 49. For example, at his deposition Rodriguez described a trip that he took on April 8, 2014 as a driver to Delaware and Pennsylvania, which he described would "not be out of the ordinary" for him to do while he worked at Welpak. See Id., at ¶ 50.

<u>William Torres acted as a Driver's Helper on Welpak trucks in Interstate Commerce</u>

Welpak employed William "Willy" Torres as a driver's helper from on or about March 4, 2013 to on or about October 24, 2014. Defs' 56.1 Stmt, at ¶ 51. Welpak maintains time sheets and payroll records to show how many hours Torres worked every week and how much he was paid for every hour he worked. Id., at ¶ 52. Torres spent approximately 97% of his work time at Welpak doing truck-related activities. Id., at ¶ 53.

When Torres was paid, every two weeks, he would receive a computer printout of his hours reportedly worked in the previous two weeks with his paystub, so he could compare the hours that he punched in/out with the hours on his paystub and verify their accuracy. Defs' 56.1 Stmt, at ¶ 54. Torres' regular rate throughout his employment at

6

Welpak was $18 an hour. Id., at ¶ 55. When Torres worked over 90 hours in a two-week period, he was paid at an overtime rate of $27 an hour. Id., at ¶ 56.

Welpak hired Torres as a driver's helper and, indeed, he verified at his deposition that he typically was on the trucks. Defs' 56.1 Stmt, at ¶ 58. Torres also confirmed at his deposition that he worked as a driver's helper when his co-worker, Christopher Fox drove trucks "almost every day." See Id., at ¶ 59. Indeed, throughout Torres' employment at Welpak, he rode on trucks that travelled in interstate commerce as a driver's helper. Id., at ¶ 61. Torres never maintained his own personal records of the daily assignments or the hours he worked and has no basis to contradict the route sheets maintained by Welpak. Id., at ¶ 62.

Torres rode as a driver's helper on trucks for Welpak throughout the eastern seaboard throughout his employment. Defs' 56.1 Stmt, at ¶ 63. For example, at his deposition Torres stated that he worked as a helper on Bond's truck many times. Id., at ¶ 64. Torres confirmed at his deposition that although he had no specific recollection of any day at Welpak that he might very well have participated in trips, as per Welpak records, to Linden, New Jersey, Greenwich, Connecticut, Darien, Connecticut, Westport, Connecticut, Shrewsbury, New Jersey, Perth Amboy, New Jersey, West Orange, New Jersey, Saddlebrook, New Jersey, Philadelphia, Pennsylvania, Bryn Mawr, Pennsylvania, Springfield, New Jersey, Sandisfield, Massachusetts, Southfield, Massachusetts, New Castle Delaware, and Greenwich, Connecticut. Id., at ¶ 65.

Application of the Federal Motor Carrier Act to Welpak's operations

At a minimum, to obtain a CDL under US DOL, one needs to pass a written and road test. Defs' 56.1 Stmt, at ¶ 66. Drivers, such as Bond and Rodriguez, also had to

submit to yearly medical reviews, federal drug testing and alcohol tests under US DOL regulations. Id., at ¶ 67. Upon their respective hires, Bond and Rodriguez signed Fair Credit Reporting Act (FCRA) Disclosure Statements that allowed Welpak to obtain their driving records required by the Federal Motor Carrier Safety Regulations. Id., at ¶ 68.

Drivers, such as Bond and Rodriguez, were responsible as drivers for the safety of the trucks they drove. Defs' 56.1 Stmt, at ¶ 69. For example, drivers are required under US DOT regulations for drivers in interstate commerce to inspect the vehicle before and after they went out on the road. Id., at ¶ 70. Drivers were also responsible as part of a team of driver and driver's helpers for the proper and safe loading and unloading of trucks. Id., at ¶ 71. In addition, driver's helpers, such as Torres, were responsible for the proper and safe loading and unloading of the trucks. Id., at ¶ 72. Supervisors and others would provide hands-on training on the proper loading/unloading of the trucks. Id., at ¶ 73.

Welpak maintained route sheets issued on a daily basis to inform drivers and driver's helpers as to their daily assignments, who would be driving the trucks, who would be acting as a helper on the various trucks, and where the truck was supposed to go. Defs' 56.1 Stmt, at ¶ 74. Except in the case of last minute changes, the vehicle that each particular driver would drive and the assigned helper would be listed on the daily route sheets. Id., at ¶ 75.

The Trucks Leased by Welpak

Welpak leased several trucks during the course of the respective employments of the Plaintiffs. Defs' 56.1 Stmt, at ¶ 76. Each truck would list Welpak's US DOT number (778253) on the outer door as well as Welpak's MC number (MC363810). Id., at ¶ 77.

Welpak's Bills of Lading, which were kept in the trucks on a daily basis, would also list the company's US DOT number (778253) and MC number (MC363810). Id., at ¶ 78.

Unit 360, which was also known by the nickname "Racer" is a 2007 tractor truck with an affixed box with the gross vehicle weight of 33000 pounds. Defs' 56.1 Stmt, at ¶ 79. Bond and Rodriguez both regularly drove Unit 360 many times. Id., at ¶ 80. In addition, Torres worked as a driver's helper on Unit 360 many times throughout his employment. Id., at ¶ 81.

Unit 093, which was also known by the nickname "Dasher" is a 2007 straight truck with the gross vehicle weight of 14500 pounds. See Id., at D185. Defs' 56.1 Stmt, at ¶ 82. Bond and Rodriguez both regularly drove Unit 093 many times throughout their respective employments. Id., at ¶ 83. Torres worked as a driver's helper on Unit 093 many times throughout his employment. Id., at ¶ 84.

Unit 491 is a 2013 tractor truck with an affixed box with the gross vehicle weight of 32350 pounds. Defs' 56.1 Stmt, at ¶ 85. Bond and Rodriguez both regularly drove Unit 491 many times throughout their respective employments. Id., at ¶ 86. Torres worked as a driver's helper on Unit 491 many times throughout his employment. Id., at ¶ 87.

Unit 9104 is a 2008 GMC straight truck with the gross vehicle weight of 25950 pounds. Defs' 56.1 Stmt, at ¶ 88. Bond and Rodriguez both regularly drove Unit 9104 many times throughout their respective employments. Id., at ¶ 89. Torres worked as a driver's helper on Unit 9104 many times throughout his employment. Id., at ¶ 90.

Unit 371 is a tractor truck with an affixed box with the gross vehicle weight of 32350 pounds. Defs' 56.1 Stmt, at ¶ 91. Bond and Rodriguez both regularly drove Unit

371 many times throughout their respective employments. Id., at ¶ 92.   Torres worked as a driver's helper on Unit 371 many times throughout his employment. Id., at ¶ 93.

Unit 6245, which was also known by the nickname "Bertha" is a straight truck with the gross vehicle weight of 25950 pounds. Defs' 56.1 Stmt, at ¶ 94.   Torres worked as a driver's helper on Unit 6245 many times throughout his employment. Id., at ¶ 95.

## ARGUMENT

### A.  The Summary Judgment Standard

Summary judgment is appropriate "if the movant shows there is no genuine dispute as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. 56(a). A dispute as to a material fact is "genuine" only if sufficient evidence exists for a reasonable jury to return a verdict for the non-moving party. See Anderson v. Liberty Lobby Inc., 477 U.S. 242, 249 (1986).   A factual dispute is "material" only if it might affect the outcome of the case. Id. at 248.

The party seeking summary judgment must set forth and identify those portions of  "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). After this initial burden is met, the non-moving party bears the burden of demonstrating disputes of material fact.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  The non-moving party must produce evidence to support its position, and may not rest on conclusory allegations or bare assertions. See Lujan v. National Wildlife Fed'n, 497 U.S. 871, 888 (1990).

In a FLSA action, the employer bears the burden of proving that its employees

come within the scope of an exemption from the FLSA's overtime requirements. See Martin v. Malcolm Pirnie, Inc., 949 F.2d 611, 614 (2d Cir. 1991). As such, once the employer proves that it is exempt from the FLSA's overtime requirements, the burden shifts to the employee to demonstrate disputes of material fact. See Id. (citing Anderson, 477 U.S. at 250).

Here, summary judgment in favor of Defendants is appropriate because there are no material facts in dispute, and the MCA exemption applies to all of Welpak's drivers and driver's helpers and, particularly Plaintiffs Bond, Rodriguez and Torres. As a matter of law, Defendants are entitled to judgment in their favor.

## B. The Motor Carrier Exemption Applies Because Drivers and Driver's Helpers Transport Property in Interstate Commerce

The FLSA requires that employees engaged in interstate commerce be paid "at a rate not less than one and one-half times the [employee's] regular rate" of pay for work in excess of forty hours in any workweek. 29 U.S.C. § 207(a). However, Congress has exempted a broad range of employees from this rule. See 29 U.S.C. § 213. For example, the motor carrier exemption exempts from the FLSA's overtime provisions any employee with respect to whom the Secretary of Transportation (the "Secretary") has power to establish qualifications and maximum hours of service pursuant to 49 U.S.C. § 31502.

Section 31502 grants the Secretary the authority to prescribe qualifications and maximum hours of service of employees of a motor carrier. This grant of authority applies to transportation by motor carrier of property in interstate or foreign commerce on a public highway. 49 U.S.C. § 13501.

Whether the motor carrier exemption applies to an employee depends on the nature of both the employer's and the employee's activities. 29 C.F.R. § 782.2(a). First, the

11

employer must be within the jurisdiction of the Secretary by virtue of operating as a "motor carrier," as defined by the statute. Dauphin v. Chestnut Ridge Transp., Inc., 544 F. Supp. 2d 266, 273 *77 (S.D.N.Y. 2008). Second, the individual employee must fall within an exempt classification, which the Supreme Court has held is a determination to be made by the courts. Pyramid Motor Freight Corp. v. Ispass, 330 U.S. 695, 707 (1947).

In making this determination, the name given to the position is not controlling, rather it is the character of the activities involved in the employee's performance of his job that controls. Pyramid Motor Freight Corp., 330 U.S., at 707-08. "According to the Department of Labor regulations, the employee must 'engage in activities of a character directly affecting the safety of operation of motor vehicles in the transportation on the public highways of passengers or property in interstate or foreign commerce within the meaning of the Motor Carrier Act.'" Williams v. Tri-State Biodiesel, L.L.C., No. 13 Civ. 5041 (GWG), 2015 WL 305362, at *5 (S.D.N.Y. Jan. 23, 2015) (quoting 29 C.F.R. § 782.2(a)). The four broad categories of workers whose duties are said to directly affect the safety of vehicle operation are: (1) drivers, (2) mechanics, (3) loaders, and (4) helpers of the first three. Id. However, "[i]f not all of an employee's activities affect the safety of operations of motor vehicles in interstate commerce, a court must consider 'the character of the activities rather than the proportion of either the employee's time or his activities.'" Id., (quoting Morris v. McComb, 332 U.S. 422, 431-32 (1947)); see also Fox v. Commonwealth Worldwide Chauffeured Transp. of NY, LLC, 865 F. Supp. 2d 257, 266 (E.D.N.Y. 2012) ("What matters is the degree to which a worker's activities affects safety, not the amount of time the worker spends on that activity." (citing Levinson v. Spector Motor Serv., 330 U.S. 649, 674-75 (1947))).

12

### 1. Welpak is Properly Classified Within the Jurisdiction of the Secretary by Virtue of Operating as a "Motor Carrier"

In order for the Secretary to have jurisdiction over Defendants, Welpak must qualify as a "motor carrier," i.e., a "person providing commercial motor vehicle transportation for compensation." 49 U.S.C. § 13102(14). Pursuant to the current statutory framework, a "commercial motor vehicle" is "a self-propelled or towed vehicle used on the highways in interstate commerce to transport passengers or property, if the vehicle ... has a gross vehicle weight rating or gross vehicle weight of at least 10,001 pounds, whichever is greater." 49 U.S.C. § 31132(1). In this case, it is undisputed that the each of trucks that were regularly driven and ridden on by the Plaintiffs were used in interstate commerce and had gross vehicle weights of more than 10,001 pounds.

First, Welpak leased six trucks during the course of the respective employments of the Plaintiffs. Defs' 56.1 Stmt, at ¶ 76. Unit 360, which was also known by the nickname "Racer" is a 2007 tractor truck with an affixed box with the gross vehicle weight of 33000 pounds. Id., at ¶ 79. Unit 093, which was also known by the nickname "Dasher" is a 2007 straight truck with the gross vehicle weight of 14500 pounds. Id., at ¶ 82. Unit 491 is a 2013 tractor truck with an affixed box with the gross vehicle weight of 32350 pounds. Id., at ¶ 85. Unit 9104 is a 2008 GMC straight truck with the gross vehicle weight of 25950 pounds. Id., at ¶ 88. Unit 371 is a tractor truck with an affixed box with the gross vehicle weight of 32350 pounds. Id., at ¶ 91. Unit 6245, which was also known by the nickname "Bertha" is a straight truck with the gross vehicle weight of 25950 pounds. Id., at ¶ 94.

Accordingly, it cannot be disputed that Welpak's vehicles are "commercial motor vehicles" for purposes of the Motor Carrier Act because each of the vehicles' respective gross vehicle weight exceeds 10,001 pounds.

Second, in order for the Secretary of Transportation to have jurisdiction over Welpak, it must be engaged in the transportation of passengers or property "between a place in (A) a State and a place in another State; [or] (B) a State and another place in the same state through another State." 49 U.S.C. § 13501. Again, the undisputed facts of this case show that all three Plaintiffs concede that they regularly made runs throughout the entire eastern seaboard of the United States.

Rodriguez concede that throughout his employment at Welpak, he drove trucks in interstate commerce. Defs' 56.1 Stmt, at ¶ 48. Rodriguez drove trucks pursuant to his official duties for Welpak through every state from New York, New Jersey and Connecticut to Georgia throughout his employment. Id., at ¶ 49. For example, at his deposition Rodriguez described a trip that he took on April 8, 2014 as a driver to Delaware and Pennsylvania, which he described would "not be out of the ordinary" for him to do while he worked at Welpak. See Id., at ¶ 50.

Similarly, Bond conceded that throughout his employment at Welpak, he drove trucks in interstate commerce. Defs' 56.1 Stmt, at ¶ 29. Bond drove trucks pursuant to his official duties for Welpak through every state from New York and Connecticut to Florida throughout his employment. Id., at ¶ 30.

Finally, Torres confirmed at his deposition that although he had no specific recollection of any day at Welpak that he might very well have participated in trips to Linden, New Jersey, Greenwich, Connecticut, Darien, Connecticut, Westport, Connecticut, Shrewsbury, New Jersey, Perth Amboy, New Jersey, West Orange, New Jersey, Saddlebrook, New Jersey, Philadelphia, Pennsylvania, Bryn Mawr, Pennsylvania,

Springfield, New Jersey, Sandisfield, Massachusetts, Southfield, Massachusetts, New Castle Delaware, and Greenwich, Connecticut. Id., at ¶ 65.

Even if Plaintiffs were to argue that some of the work that they performed was limited to the State of New York, that, in of itself, does not defeat the instant motion. In Bilyou v. Dutchess Beer Distributors, Inc., the Second Circuit recognized that "[e]ven if a carrier's transportation does not cross state lines, the interstate commerce requirement is satisfied if the goods being transported within the borders of one state are involved in a practical continuity of movement in the flow of interstate commerce." 300 F.3d 217, 223 (2nd Cir. 2002) (quoting Walling v. Jacksonville Paper Co., 317 U.S. 564, 568 (1943)). See also Foxworthy v. Hiland Dairy Co., 997 F.2d 670, 672 (10th Cir. 1993); Reich v. American Driver Serv., Inc., 33 D.3d 1153, 1155, n. 3 (9th Cir. 1994); 29 C.F.R. § 782.7(b)(1).

Even when employees of a motor carrier engage in interstate transportation "during a minority of their time [working]," the MCA exemption still applies due to the jurisdiction that the responsible federal agency has over setting the employees' qualifications and maximum hours of service. Morris, 332 U.S., at 437-438. In Morris, the regional Wage and Hour Division Administrator for the Department of Labor brought a suit against an employer, a "common carrier," for failing to pay its drivers and mechanics overtime under the FLSA. Id., at 424-425, 426. The Court found that the employer was an interstate carrier even where only 4% of trips were made in interstate commerce. Id., at 432.

The conclusion that Defendants are a motor carrier subject to the authority of the Secretary of Transportation as further evidenced by the fact that Welpak is indeed registered with the United States Department of Transportation (US DOT) as a motor

carrier. Defs' 56.1 Stmt, at 7.  Since in or about 1997, Welpak has been registered under the US DOT Number 778253 and a Certificate of Public Convenience and Necessity, No. MC-363810, which are both imprinted on the outside door of the trucks that Welpak leases. Id., at ¶¶ 8-9.

Here, the amount of time that all Plaintiffs spent in interstate trips was significant. Indeed, Welpak derives at least 50% of its gross income from interstate commerce.  Defs' 56.1 Stmt, at ¶ 11.  In addition, in order to comply with the US DOT regulations for holders of CDLs, Welpak also maintains "Driver Qualification Files' for its drivers, including Bond and Rodriguez, reflecting that the drivers meet the minimum qualifications for drivers of commercial motor vehicles in interstate commerce.  Id., at ¶ 13.  In the Driver Qualification File, as detailed by a US DOT Federal Motor Carrier Safety Administration summary, for each driver, Welpak includes (a) the driver's application for employment; (b) an inquiry sent to state agencies regarding the driver's driving record for the preceding three years; (c) an inquiry sent to state agencies requesting the driver's annual driving record; (d) the motor carrier/employer's annual review of the driver's driving record; (e) the driver's annual certification of motor vehicle violations; (f) the driver's road test certificate; and (g) the driver's proof of medical clearance, the medical Examiner Certificates.  Id., at ¶ 14.  See e.g., Songer v. Dillon Res., Inc., 618 F.3d 467, 469-70 (5th Cir. 2010) (holding that truck drivers fell within MCA exemption where employer required them each to hold "a valid Class A commercial driver['s] license and meet the driver qualification requirements of" the FMCSA, and issued them the Pocketbook containing "a compilation of relevant regulatory information"); Resch v. Krapf's Coaches Inc., 14-3679, at *4 (3d Cir. May 12, 2015) (granting summary judgment where unrefuted evidence

reflects KCI's adherence to federal regulations regarding the drivers, such as that each driver possess a valid CDL, comply with FMCSA drug testing requirements, submit to regular DOT physical examinations, and provide a pre-employment "Safety Performance History Record").

Accordingly, Defendants are clearly a motor carrier within the meaning of the Motor Carrier Act.

### 2. Each of the individual Plaintiffs fall within an exempt classification under the Federal Motor Carrier Act

<u>Bond and Rodriguez, as drivers, are overtime exempt under the FMCA</u>

The case law regarding the motor carrier exemption's application to drivers is well-established. <u>See</u> <u>e.g.</u>, <u>Morris</u>, 332 U.S. at 430 ("The drivers are full-time drivers of motor vehicles well within the definition of that class of work by the Commission if the work is done in interstate commerce."); <u>Bilyou v. Dutchess Beer Distribs., Inc.</u>, 300 F.3d 217, 222 (2d Cir. 2002) (finding that the Secretary of Transportation had jurisdiction over defendant's drivers because they operated vehicles in interstate commerce); <u>Dauphin</u>, 544 F. Supp. 2d at 274 (noting that "[t]he activities of drivers affect safety of operations of motor vehicles, and thus, drivers may come within the scope of the motor carrier exemption if their duties involve 'transportation on the public highways of passengers [or property] in interstate . . . commerce'"); <u>Alleyne v. Time Moving & Storage Inc.</u>, 264 F.R.D. 41, 45 (E.D.N.Y. 2010) (noting that common examples of employees who fall under the motor carrier exemption include "employees who drive an employer's motor vehicles").

Here, Bond and Rodriguez admit that they were drivers; therefore, their duties necessarily affected the safe operation of vehicles in interstate commerce that had gross vehicle weight over 10,001 pounds, regardless of whether they were ever called upon to

drive any smaller vehicles or engaged in any other duties. Defs' 56.1 Stmt, at ¶¶ 29, 48. See e.g., Alleyne v. Time Moving and Storage, Inc., 264 F.R.D. 41, 51 (E.D.N.Y. 2010) (holding that a person who even performs safety-affecting activities only part of the time are "every bit as overtime-exempt" as those who do so full time); Avery v. Chariots for Hire, 748 F.Supp.2d 492, 500 (D. Md. 2010) (holding that a chauffeur who sometimes drove vehicles carrying at least eight passengers was exempt, even though he also sometimes drove smaller vehicles; Dalton v. Sabo, Inc., 2010 WL 1325613 (D.Or. April 1, 2010) (employees who were or could be called on in the ordinary course of their work to drive commercial motor vehicles are subject to the motor carrier exemption, even if they also drove lighter vehicles).

In addition, Bond and Rodriguez conceded they were responsible as drivers for the safety of the trucks they drove. Defs' 56.1 Stmt, at ¶ 69. In addition to the safety implications of their driving activities, drivers also are required under US DOT regulations for drivers in interstate commerce to inspect the vehicle before and after they went out on the road. Id., at ¶ 70.

Accordingly, Bond and Rodriguez are exempt from overtime under the FMCA and their overtime claims under the FLSA must be dismissed.

Torres, as a driver's helper and loader, is overtime exempt under the FMCA

Among the broad categories of workers whose duties are said to directly affect the safety of vehicle operation includes loaders and helpers of drivers in interstate commerce. See Levinson, 330 U.S. at 673; see also Pyramid Motor Freight Corp., 330 U.S. at 707 (recognizing the power of the Interstate Commerce Commission, which was

formally empowered under what is today § 315102, to establish safety-affecting classes of workers).

In Levinson and Pyramid, the Court instructed that a worker need not spend all of his or her time on activity related to one of these categories, but such duties must actually affect the safety of operating vehicles in a non-trivial way. See Pyramid, 330 U.S., at 707-08. What matters is the degree to which a worker's activities affects safety, not the amount of time the worker spends on that activity. See Levinson, 330 U.S. at 674-75.

Here, it is undisputed that Torres was employed as a driver's helper and, in his own words, stated at his deposition that is was typically on the trucks. Defs' 56.1 Stmt, at ¶ 58. Torres also cannot skirt the confirmation that he gave at his deposition that he worked as a driver's helper when his co-worker, Christopher Fox drove trucks "almost every day." See Id., at ¶ 59. Further, throughout Torres' employment at Welpak, he testified that he rode on trucks that travelled in interstate commerce as a driver's helper. Id., at ¶ 61. Significantly, Torres has no basis to dispute any of these contentions because he never maintained his own personal records of the daily assignments or the hours he worked and has no basis to contradict the route sheets maintained by Welpak. Id., at ¶ 62.

Torres' conceded "truck-related" activities more than sufficiently meets the standard adopted recently in this Circuit in the recent case of Fox v. Commonwealth Worldwide Chauffeured Transportation of NY, LLC, 865 F.Supp.2d 257 (E.D.N.Y. 2012), where Judge Garaufis adopted the majority view that an employer must establish "some nexus" between an individual worker's duties and the use of commercial motor vehicles. Id., at 271; see also Avery v. Chariots For Hire, 748 F.Supp. 2d 492, 499-501 (D. Md.

2010); <u>Daulton v. Sabo</u>, No. 09-CV-358 (AA), 2010 WL 1325613, at *3 (D. Or. Apr. 1, 2010); <u>Brooks v. Halsted Commc'ns</u>, 620 F. Supp. 2d 193, 202 (D.Mass. 2009); <u>Hernandez v. Brink's Inc.</u>, No. 08-CV-20717, 2009 WL 113406, at *5 (S.D. Fla. Jan. 15, 2009).

Finally, while drivers, such as Bond and Rodriguez, were responsible as drivers for the safety of the trucks they drove, the entire team of driver and driver's helpers (including Torres) were responsible for the proper and safe loading and unloading of trucks. Defs' 56.1 Stmt, at ¶¶ 71-72. In order to make sure this was performed in a safe and proper manner, supervisors and others would provide hands-on training on the proper loading/unloading of the trucks. <u>Id.</u>, at ¶ 73.

Accordingly, Torres is exempt from overtime under the FMCA as a loader and driver's helper and his overtime claim under the FLSA must be dismissed.

### C. Plaintiffs' Second Cause of Action for Failure to Pay Overtime under State Law is Subject to Dismissal Due to the Motor Carrier Exemption

The motor carrier exemption also operates to extinguish Plaintiffs' New York state law claims relating to overtime. New York Courts recognize that because New York's overtime exemptions are specifically defined in reference to the FLSA, the FLSA's exemptions and the interpretations of the FLSA are controlling in New York. "New York's overtime provisions expressly incorporate the FLSA exemptions." <u>Torres v. Gristede's Operating Corp.</u>, 628 F. Supp. 2d 447, 456 (S.D.N.Y. 2008). The Eastern District of New York has found that, "New York's overtime law incorporates most of the FLSA's substantive provisions and exemptions, and a court's analysis under federal and state law will, in this and most cases, be the same." <u>Kahn v. IBI Armored Serv., Inc.</u>, 474 F. Supp. 2d 448, 450 n.1 (E.D.N.Y. 2007) (applying the same analysis of applicability of

the motor carrier exemption to claims under both FLSA and the New York state overtime law).

Therefore, Plaintiffs' overtime cause of action under the NYLL must also be dismissed.

### D. This Court Should Decline to Exercise Supplemental Jurisdiction Over the Plaintiffs' Remaining State Law Claims

Pursuant to 28 U.S.C. § 1367(c)(3), the court "may decline to exercise supplemental jurisdiction" over a state law claim when the court "has dismissed all claims over which it has original jurisdiction."   The Second Circuit has repeatedly emphasized that when "federal claims are eliminated in the early stages of litigation, courts should generally decline to exercise pendent jurisdiction over remaining state law claims." Klein & Co. Futures, Inc. v. Bd. Of Trade of the City of New York, 464 F.3d 255, 262 (2d Cir. 2006); see also Kolari v. New York-Presbyterian Hosp., 455 F.3d 118, 122 (2d Cir. 2006) ("'[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors...will point toward declining to exercise jurisdiction over the remaining state-law claims.'") (quoting Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n. 7 (1988)).

Here, the Court should decline to exercise supplemental jurisdiction over any remaining state claims because all of Plaintiffs' federal law claims, as described above, require dismissal.

## CONCLUSION

For all the foregoing reasons, the Defendants respectfully request that the Court grant their summary judgment motion to dismiss the Complaint along with such other and further relief as the Court deems just and proper.


Dated: August 10, 2015
       Glen Cove, New York

                       Respectfully submitted,

Adam C. Weiss (AW-5752)
THE LAW FIRM OF ADAM C. WEISS, PLLC
3 School Street, Suite 303
Glen Cove, New York 11542
(516) 277-2323 (tel)
(516) 759-2556 (fax)
Email: adam@acweisslaw.com

*Attorneys for Defendants*